President, Judge Boggs, and members of the Court, my name is Bradley Davis Barbin. I represent the Plaintiff Appellant Svetislav Vujovic. This was a very close case. I did not try the case. I became counsel at sentencing. The trial attorney who did present the case for the United States government is here to make the appellate argument as well. We're not after a fair trial. We're after a fair trial that is not violative of the Constitution. There are always imperfections. There are always mistakes. We understand that without constitutional violation, the mistakes don't matter. Not at this level. But there are two portions of this trial that matter and are significant constitutional violations. The first, dealing with Brady. Simply put, there is a Brady violation when applications which corroborate the defendant's trial testimony are withheld from the defense counsel and are only learned about as government witnesses testify in the case, that being Ms. Martin and Mr. Vardaman. The reason why these documents are so critical is not just the missing section, page 2 and page 3 of the application, but more importantly, if you had the bank application, you as a defense counsel would have been able to go and interview that person. And ask them, is what Mr. Vujovic is testifying to? I was told all I fill out is part A. It goes into a computer. The rest of it is done there by the star witness, Mr. Raguse. If that's what they're told, exactly what Mr. Vujovic testifies to, then the whole trial about his knowledge or his intent to defraud a federal credit union is in play. And with respect to the outcome, there is a reasonable probability if these other customers of the bank had gotten large million-dollar loans, ostensibly for businesses they ran, he would not have appeared to be the only witness against Raguse. And the trial judge himself said, Raguse had to be believed. That's how close this case was. It was you and him. They chose to believe you. What I'm saying is, they didn't play fair with respect to whether Raguse should be believed. One of the things we look at, of course, is whether it would have made any difference. And in addition to filing out, filing these false loan applications, he's also charged with bribing Raguse. Are those different counts, the false applications? They are different counts, Your Honor. But they're related, and we do not agree that these are false applications. That's the government's theory. And they held back anything that didn't support their theory. It is an inaccurate application, but the word false goes directly to this issue of, did you knowingly commit a crime? Everybody admitted in this case that there was rampant abuse in this credit union. There's some 20 other people that were charged. There's nothing secret about that. There were hundreds that weren't. They whited out the loans. None of those whited out loans were turned over. You change things. First of all, you don't want a fair trial. I think you meant you didn't want a perfect trial. You do want a fair trial. This is a close case. I don't know why this is a close case. Then I say there were 20 or so other people that were charged. You say there were hundreds of something? Who were not charged. Who had these blank applications. Who would have corroborated the defendant's testimony. That when you go in there with blueprints and your business plans, they say, just give me your name, rank, and serial number on Part A. Did anybody ever claim that there weren't hundreds of other blank loan applications? The defense lawyer didn't do his job. He didn't interview the bank tellers at all. He didn't get any of the applications. He didn't file any motions. In the trial, was there any dispute about whether or not there were lots of loan applications of your guy and others that were not completely filled out? That was brought out during the trial, was it not? Government witnesses for the first time through Vardaman and Martin. Was it agreed by everybody during this trial that there were lots of other loan applications that were not completely filled out? I would not say it was agreed. I would say it was raised peripherally in cross-examination. So, I'm not telling you that the issue didn't come up. What I'm saying is it didn't come up in time for the defense lawyer to get out there and hustle and get people into court to say, I was told the same thing by the bank. I think they're related. Not to whether the government in some way withheld things that should have been turned over because it sounds like you're saying that there were, it's not like there was a smoking gun from one particular application. You're saying this is the way that business was being done and there was plenty of opportunity, as you say, he didn't do his job, to delve into that as opposed to whether the government should have thought correctly that this was exculpatory material. I mean, isn't that where you were starting to go? Well, I would say that the Brady and the ineffective assistance in this case uniquely, like no other case I've ever seen, I've been doing this for 30 years, are entwined. And here's why. In Ramones v. Burkis, you have a case where the circuit reverses because you don't go out and interview three critical witnesses. And what I'm saying is the defense counsel didn't know he could get good testimony from the bank tellers. And we know that because at sentencing we have Deb Peledy's exhibit, which is part of the sentencing record, saying we put this into a computerized form and it went to Mr. Raguse, arguably on car loans, but if we had been permitted to expand that, you would see that the testimony of the government witness saying there were hundreds of these loan applications filled most is the word that Mr. Vardaman used. Ms. Martin said the same thing in her testimony. The applications are what drive you to the corroborative witness, but if you don't get the applications, you don't get the witness. And you also don't impeach Raguse, which the judge says is the most important witness. But why is it impeaching of Raguse? Did Raguse say, oh, we made everybody fill out every line? No, what he said, and this really is very hard for me to understand, in the protective order documents that the court refuses to release so you can review them, in the protective order documents he specifically says the defendant probably didn't know about the increases on what are called offset loans. You take out an original loan, but because you can't pay it back, they increase it up and up and up. The defense counsel doesn't catch that in the 74 pages that Ms. Brennan turns over the weekend before the trial. That's critical. And I say, well, Brady's still about sentencing. I should be able to bring Raguse back. I should be able to ask the questions. And if the government knows the offset numbers are at least questionable, when Raguse himself said he probably didn't know, how can she argue to the jury he did know? Aren't you vouching for someone you know has questionable credibility? And can you continue to do that at sentencing? And remember, this case isn't just about a new trial, it's about a remand, because if you've improperly calculated the guideline and given him an extra two points, you're putting him up in a higher range. You started out by saying there were two points you wanted to hit. Ineffective assistance and Brady. Oh, not the sentencing. Well, that's the constitutional violation. Remand. No. Well, okay. You know we have a lot of issues. It's your time. The major issues for us are, is this constitutionally fair? So your second constitutional point is the ineffective assistance. Exactly. Does he have to do his job? Does he have to interview witnesses? Why would we get this to ineffective assistance in this case? Because it's clear on the record. This is one of those unique cases where he says it himself. He doesn't know the names of the witnesses in the opening. He doesn't know the amounts. He says the defendant hid money in banks in his opening statement. Remember, he's the defense lawyer, not the prosecutor. The prosecutors decide to bully the defendant even before the trial starts by saying, Judge, we've got to reel this guy in, and the defense lawyer goes along with it. Generally, we would like to know why lawyers do things. Yeah. And could there be a strategic reason? Is that shown in this record? There is no reason for him not to have interviewed the defendant. Is the reason why he did something shown in the record? Yes, I think it is. Where do I look for that? Well, we cite in our brief, in the pre-trial, we cite I think you can see it. It's in the first three pages before the trial even begins. And the defense attorney isn't even objecting. He's not filing any motions in limine with respect to things that don't belong in the trial, that have nothing to do with the federal credit union's loans. Counselor, your red light is on. Did you reserve any time for rebuttal? Five minutes, Your Honor. Thank you. Thank you. You'll have that time for rebuttal. Good morning, Your Honors. My name is Bridget Brennan, and I represent the United States. The appellant wants this court to find that the government, the trial court, and trial counsel all violated his constitutional rights without any record to support it, a record that he had the burden to make and he didn't do. The trial court even found in two separate rulings that the defendant, or I'm sorry, the appellant, had not made the appropriate record to support the very arguments and assertions he makes here. With respect to the first two assignments of error, Your Honors, I would point out for the court that the defendant called this a close case. It was not a close case. This is a case where Mr. Vujovic admitted to three federal agents that he bribed Raguse and that he submitted false loan applications in connection with this scheme involving Mr. Raguse and the credit union. In order for the appellant to be granted relief on the first two assignments of error, this court would have to turn Brady on its head. It was his burden to prove that the items about which he claims or disputes were exculpatory, that they were suppressed, and that there was prejudice as a result. The blank loan applications of other members in a credit union that was so rife with fraud that, as Russell Vardaman testified, went from conservatorship to liquidation in just one week, does not exculpate this defendant. He admitted at pages 1649 to 1650 that he signed all of the loan applications that were part of the government's relevant time period, October 31, 2003 to January 24, 2008. That's not a dispute. The fact that items were not fully included, he testified on direct that he had the opportunity to review those and that he put in there, as he said, what he was told to put in. He even got the opportunity to re-mine that area on redirect, page 1691. The fact that there were these incomplete loan applications was never hidden from the defense or the jury. In fact, the government was able to count, prior to this argument, no less than 17 computer-generated loan applications. But what's important... Sorry, you said was able to count? Yes, from the trial evidence, Your Honor. The exhibits entered at trial. No less than... So you're counting, you're saying you can count that now. That is, you didn't count it to the jury. No. No, Your Honor. I can count it now in preparation for this argument. There were no less than 17 of those applications provided to the jury at trial. As government exhibits? Yes. Yes, Your Honor. In fact, government's exhibit 5E even had the whiteout about which the appellant complains he was never shown. Are these 17 loan applications ones that involved the defendant or other borrowers? The defendant, Your Honor. The indictment here charged... So the claim seems to be not this guy's loan applications and what he was told and whether they were blank or not, but that this is what's happening with all of these other borrowers. It's still a little hard to figure out how that's exculpatory, but just because other people are cheating the credit union. But putting that aside, could you address yourself to his basic claim that somehow he was going to either impeach or provide exculpatory evidence to the jury because this is happening with everybody else? Sure, Your Honor. The government, as it stated in its brief, it's not exculpatory that other people were committing the same fraud that he was. But Rule 613 would preclude bringing in this information as impeachment against Raguse because Raguse acknowledged that he, in fact, was taking these kinds of loan applications as part of the fraud scheme and as a result of being bribed by Mr. Ruzovic. If we narrow this down a little bit, the counsel seems to be saying that he just did what he was told. And to the extent that the jury didn't believe that, that testimony would have been enhanced if he had had a whole bunch of other borrowers coming in saying, I was told the same thing, I did the same thing. Now, I guess we'd have to also know whether they're also defrauding the credit union at the same time. But speak to the question a little bit more narrowly about what difference it would have made if other borrowers said they were told the same thing and did the same thing. It would have actually corroborated Mr. Raguse. It would have had no difference in favor of the defendant, and certainly all these other borrowers were known at the time of trial. It could arguably go to the mens rea requirement, couldn't it? If they weren't intending to defraud somebody, they were just doing what they were told to get a loan. That seems to be the theory here. Well, Your Honor, I would point out that the indictment charges violations of 1344.1 and 2. So intent to defraud versus knowingly providing a false and incomplete loan application, they would be two separate things for the jury's consideration. Moving on to the issue of calendars. The appellant raises this issue, and again, there's no record to support it. There's no acknowledgment except for this reliance on post-trial interview notes of an investigator, which are not part of the record, certainly weren't available at trial. But he has the burden to show that those records actually exist. He claims in his brief that the FBI seized those. That's actually not true, and trial testimony is counter to that. Russell Vardiman stated that when the NCUA came in to engage in conservatorship, it collected all the documents, took those to Austin, Texas. Document number 84, the court ruled the NCUA is not part of the prosecution team. The prosecution team consisted of the United States Attorney's Office, the FBI, and the IRS. The court also recognized that whatever records the government had in its possession that it obtained from the NCUA was done by subpoena. This notion that these records exist has not met its burden to prove that those calendars existed, has not also proven that they were suppressed by the government. Similarly, in relying on, and in an argument here too, relying on… Well, again, even if they existed, this calendar, as I understand it, was to show that other borrowers met with the credit union president on the days in question when the defendant met with him, right? Yes. Was there any doubt about that? No, there's absolutely no doubt about it. So Raguse testified on page ID 1295 that he was bribed by no fewer than 50 credit union members and had taken hundreds of bribes. Mr. Goyevich testified at trial, page 1400, that yes, he saw the appellant here meet with Raguse privately and then close in time he took Raguse to a third-party bank to make cash deposits. But on cross-examination, Mr. Goyevich also explained that there were other members who met close in time with Mr. Raguse. So the weight of that testimony, the challenge of that testimony was all before the jury. They had the opportunity to weigh that. Well, let's say there are a couple of different sources that this cash and envelopes could have come from on a given day that was taken to the bank. It seems to me a jury believed one side and didn't believe the other, but again, putting that off to the side. There were also bribes by checks, were there not? Yes, Your Honor. Was there any dispute about the checks being written? No, he acknowledged signing them. Was there a claim made as to these checks, the check amounts being for some legitimate amount versus a bribery? Well, the defendant may have, Your Honor, but so there were several witnesses who corroborated Mr. Raguse. On the issue of bribes and how the fraud scheme developed and maintained, he was corroborated on the bribes. All I'm asking is, was there a response in the record to why these checks were written to Raguse? No. He acknowledged that there were, in fact, he being the appellant, acknowledged that his loan file did, in fact, include checks written, loan checks. In particular, there was a $502,000 loan drawn on GBRS's loan account. This is Government's Exhibit 5E. I mean, was he saying that these were actually loan payments or these are for sick kids or whatever? No. No, there was no such statement like that, Your Honor. He did not. The additional $2,000 on that loan amount was actually, that check was made out back to St. Paul Credit Union. There is no explanation for why that would occur, and Joe Goyevich even testified that there's no legitimate reason a financial institution would write a check back to itself from a loan transaction. Now, the appellant did at various times try to say that he made payments and he did make some payments. But on his cross-examination, one of the payments he tried to claim he made was a $30,703 payment, which was actually a deposit into a share account so that he could immediately write a $77,703 payment to get a Mercedes-Benz. So the issue of whether or not things were actually deposits or legitimate payments was clearly at issue during trial, Your Honor. With respect to the challenges against the trial court, because I will not address each of the items about which the appellant claims were withheld because he's simply not met his burden. If the court would like me to address any particular one, I certainly will. But at this time, in the interest of time, I'd like to move on to the challenges to the trial court. The trial court, consistent with Rule 611A and United States v. Hunt, maintained patiently an orderly trial and took into its consideration at sentencing the relevant information, in particular relevant information with respect to mitigation, in favor of the appellant. It's here, though, that the appellant's willingness to take little clips from the trial transcript to try to distort the entire proceedings becomes very apparent. The appellant claims that he was not given the opportunity to explain these computer-generated loan applications or, secondarily, that he was not given the opportunity. Are you talking about the testimony or the trial, or are you talking about the allocution at sentencing? I'd like to begin by talking about trial, Your Honor. Thank you. So this would be Assignment of Error 3. He was given those opportunities. In fact, the record belies his assertion that he wasn't. With respect to not filling out the loan applications and them being computer-generated, it's important to know he made that point on page ID 1586 and, again, in redirect, on page 1691. It's also important to know that at page 1245, Mr. Raguse explained that the information on those loan applications comes from the member. So what little information there was on those computer-generated loan applications, that information came from Mr. Vujovic. With respect to where the money went, arguably an irrelevant point, but from page 1570 to 1640, the appellant had the opportunity to explain his various businesses, his architectural drawings, payments to vendors, and other things related to these businesses. When the government, pretty late in this portion of the testimony, objected on the basis of relevancy, the trial court overruled it. He complains about interruptions. He made a reference even here today about the trial court saying, reel him in. Your Honors, I would like to point out that, again, because there's been clipping, if the courts were to review the entire trial testimony, two government agents were interrupted during their testimony because they weren't either answering the question that was asked or they were sort of speculating on what others thought or observed. The same sort of consideration, the same 611A consideration was given to Mr. Raguse, Mr. Vardiman, and Mr. Goyovic. To the extent the defendant was treated differently, as he argues, it's his own doing. At the very beginning, 1589, the court said to the appellant, this is how we answer questions, you answer the question that's asked. He said, you don't want to go rolling, you don't want to be storytelling, just answer the question that's asked. Sometimes it's difficult to get him to do that. Certainly, and it was in this case. The record shows that the defendant did not want to follow that instruction, even though he acknowledged that he understood what it was. And while the appellant focuses on page 1644, the court's comments and direction to Mr. McDonald, the trial counsel here, he doesn't give the court page 1643, which he made a very similar outburst saying, I'm here to tell the truth. And the court said, please don't editorialize, just answer the question, Mr. Vujovic, very patiently. And not even four, maybe five questions later, the appellant, same outburst. And at that point, yes, the court looked to Mr. McDonald to streamline the questioning to keep the defendant within the rules of evidence and to maintain an orderly courtroom. That's all the trial court was doing. Otherwise, all the points he wanted to make, he made, and they're in the record. With respect to sentencing, for nine pages, the defendant went on, almost in violation of U.S. v. Hunt, saying how he was innocent of the charges. The court patiently waited and then finally just stated, this is not, essentially, this isn't sympathetic. And the court actually directed the appellant to what things the court would consider in mitigation. He helped the appellant, which is why he got a mid-range sentence. With respect to the loss calculation, for the same reason that the other members' loan applications are not relevant, they wouldn't help in a loss calculation either. This case was always about this defendant's conduct, his personal loan accounts, his business loan accounts. That was the universe at issue and the universe before the jury. What happened in other accounts, the rife fraud throughout the credit union, the absolute destruction of a credit union that had been in existence since the 1940s, everybody understood what that was. He was a part of that, but he was only charged with his part of that. And the loss calculations are the same. Your Honor, my time is running up, so I will simply say that the trial court has ruled on the arguments and the assertions. There is no record to support the arguments and the assertions made here. In fact, the record that exists is inconsistent with the arguments and assertions. And for that reason, the government would ask that Your Honors affirm the trial court below. Thank you. Thank you, counsel. Ruben, you have five minutes for rebuttal. Thank you. With respect to the court's comments and the attempts by the government to control the witness before the trial even started, that may be found at page ID 884-1000. That's document 67. Page 13, lines 18 through 25. And he says, which I think bluntly from an efficiency standpoint will enable the defense to walk the defendant through his testimony in some sort of way where he can maybe be controlled a little bit bluntly, is exactly what he says right before he testifies in his own defense. And as Brennan gets up. Are you saying this is wrong? I'm saying it's wrong for the prosecution before the trial begins to say, Judge, you should have a bad impression of this defendant. You should think he's not going to be able to control himself. And if you look at the transcript, you see he wasn't really a difficult witness to handle at all. He didn't go on long rambling rants. And I don't know how a defense attorney could possibly agree to this pre-rule before opening. I don't understand why he wouldn't object to it when Ms. Brennan got up and said, I've had the experience of meeting this defendant, and I've talked to him, and I do have some concerns that when he gets up there and takes his stance, he's going to just start blurting out whatever he wants to say. Is that to the court or the jury? To the defense attorney, to Mr. Dettelbach, the U.S. attorney who was her trial counsel, and the court. My point is... I'm just completely mystified by whether the lawyer was right or wrong in the characterization of this defendant. The lawyer had a concern, brought it up to the court, and the court simply said what courts generally do. Are you saying this somehow poisoned the trial with the judge? Or I don't get the point you're making. My point is he was steamrolled from the beginning to the end. The defense attorney did not object. The defense attorney did not file motions to eliminate. The defense attorney didn't do his job. He steamrolled because the judge said don't let your client... It wasn't what the judge said. It's what the prosecutors said. Well, that's all I wanted to make. You asked for where is that in the record, and I've told you. The issue is whether this case is close. I asked you where in the record do we find out why the defense lawyer did certain things or failed to do certain things because the absence of that information is why we typically don't take up ineffective assistance in direct appeal. So is that what you just said? That's the answer? That tells me why he did or didn't do things? I think you have to determine that yourself, why he didn't do it. Got it, and now I understand. The issue is Raguse. If you withhold the loan applications, you're not learning about Raguse's false creation of whiteout applications for other people. That undermines their chief witness. That's what's unfair here. You had a witness you knew was a bad witness. When you first indicted this case, you had six counts. You brought the defendant in for a proffer. He told you his entire story. Then you added the false loan application counts. No defense attorney in their right mind brings somebody in for that proffer with those questions. So it's ineffective assistance? Do we even let him go and talk to the government? Or do we even know that he let him? It's ineffective assistance because you learn the government case and you don't do your job. You didn't get the applications. You didn't cross-examine Raguse, their only witness. And I do think this is a very close case. And I would say to you that this isn't a picture-perfect trial. The United States attorney started an opening and he said, this isn't about what he did with the money. And then he proceeds to tell the jury what he did with the money when it's convenient for him. He has a pool and a patio. We have a Google picture from satellites above. The defendant tries to say, I did that with my sweat equity. And the judge says, objection. You're not allowed to talk about how much it really costs. The IRS agent says it's a $500,000 house. It sells for $220,000. There's never any fairness about what they bring in. This prosecutor argued that in closing, the defendant had sold the wedding ring of his wife who sits in court with the wedding ring. That was inappropriate. It was also inappropriate to say you went to a casino and blew the money in a casino when you didn't have any itemization, any good basis for that. So is this a prosecutorial misconduct claim now? I'm saying, as in Cowles v. Whitley, it isn't one thing. It's a collective. If you find there is a Brady violation, you add them all up. This was an unfair trial of constitutional proportion. Because they didn't play fair with the defense attorney by giving him the one type of document that would have shown Raguse was not a credible witness. And it ties into ineffective assistance. But the most important part of this case is Brady. We should send a message to the United States Attorney and to all of the Assistant United States Attorneys. I used to be one. You can't play close in a case where a defendant wants a trial. He has a right to trial. Counsel, I think your time has expired, unless my colleagues have further questions. Thank you. That case will be submitted. And we'll give them a chance to get their papers together. And then the clerk may call the next case.